⑩

FILED

MAY - 9 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P., | |
| Debtor. | |
| BRADLEY D. SHARP, Chapter 11 Trustee, | Adv. Pro. No. 09-2543-D |
| Plaintiff, | Docket Control No. BW-1 |
| v. | |
| CSSS, LP, a California limited partnership, | DATE:   April 27, 2011 |
| | TIME:   10:00 a.m. |
| | DEPT:   D |
| Defendant. | |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

### MEMORANDUM DECISION

On January 20, 2010, Bradley D. Sharp, the plaintiff in this adversary proceeding and trustee in the underlying chapter 11[1] case of SK Foods, L.P. (the "trustee"), filed a motion for an order to show cause why the defendant CSSS, LP, dba Central Valley Shippers ("CVS"), Monterey Peninsula Farms LLC, Scott Salyer, Gerard Rose, and Larry Lichtenegger ("Lichtenegger")

---

1.     Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

1   should not be held in contempt for violation of a temporary
2   restraining order and preliminary injunction issued earlier by
3   this court (the "contempt motion").  On March 21, 2011,
4   Lichtenegger filed a motion for summary judgment on the contempt
5   motion, Docket Control No. BW-1 (the "Motion").  The Bank of
6   Montreal ("BMO"), which has acquired the trustee's claims in this
7   adversary proceeding by assignment, opposes the Motion.  For the
8   reasons set forth below, the court will deny the Motion.[2]

I.   BACKGROUND

10       This adversary proceeding concerns certain items of
11  equipment and machinery the parties refer to as a drum line and
12  the events leading up to its being transported to New Zealand in
13  August of 2009.  On August 24, 2009, this court issued an order
14  restraining and enjoining CVS, its officers, agents, servants,
15  employees, and attorneys, and those in active concert or
16  participation with them from moving the drum line to any location
17  outside of California (the "TRO").  It is undisputed that on
18  August 24, 2009, the day of the hearing, the drum line was in the
19  Port of Oakland awaiting documentation that would allow it to be
20  exported, and that it did not leave the Port of Oakland for New
21  Zealand until a week later, August 31.
22  / / /
23  / / /
24

25  _____

26       2.  In a tentative ruling issued prior to the hearing, the
    court expressed its view that the Motion was covered by the stay
    of proceedings issued by the district court.  Lichtenegger's
27  counsel argued at the hearing, as in the papers, that the Motion
    is not covered by the stay.  Upon further consideration, the
28  court finds that it can resolve the Motion without testimony of
    Scott Salyer or his criminal defense attorney.

- 2 -

## II.  ANALYSIS

### A.  Lichtenegger's Version of Events

Lichtenegger contends he "knew nothing about the Drum Line before [the trustee] applied for the TRO"[3] and that he "had no involvement with any of [the] activities" by which the drum line was moved from the premises of CVS (in Selma, California), consigned to a carrier, and ultimately shipped to New Zealand. Memo, 1:14-2:2.  The events of Friday, August 21, through Monday, August 24, 2009 are critical to the resolution of the Motion. Lichtenegger alleges this series of communications:

• The trustee's counsel called CVS's attorney, Gerard Rose, on Friday and told him he would be filing an application for a TRO and would be appearing on Monday, August 24, at 11:00 a.m. on the application.

• Rose was going to be on vacation on August 24 and asked Lichtenegger to make a special appearance on behalf of CVS to oppose the application.  Lichtenegger said he would if he could resolve a scheduling conflict.

• Lichtenegger had a telephone conversation on Friday, August 21, with Rose and Malcolm Segal, criminal defense attorney for Scott Salyer, the principal of the debtor in this case, SK Foods, L.P., to discuss the TRO hearing, during which Segal informed Lichtenegger the drum line had already shipped -- on August 20.

/ / /

/ / /

---

3.  Memorandum in Support of Larry J. Lichtenegger's Motion for Summary Judgment, filed March 21, 2011 ("Memo"), 1:13-14.

- At Rose's request, Lichtenegger called the trustee's counsel and left the voicemail message quoted below.[4]

- Lichtenegger spoke later that afternoon with the trustee's counsel, who "was very aggressive and refused to discuss the situation with him," Memo, 6:10-11, and who immediately filed a declaration that included a transcript of Lichtenegger's earlier voicemail message.

- Lichtenegger decided by Monday morning, August 24, "not to get involved," cancelled the Court Call appearance he had earlier arranged, left a voicemail message for the trustee's counsel that he would not be appearing, and did not appear at the hearing.

- Lichtenegger "had no involvement with the Drum Line or the export process after the TRO issued."

In other words, according to Lichtenegger, his involvement with the drum line was limited to his being asked to make a single special appearance and ultimately declining to make that appearance. "When [Lichtenegger] did not appear [at the hearing], his engagement was at an end . . . . [BMO] produces no evidence that Lichtenegger was asked (until weeks later) to perform any other service for CVS."[5]

> Lichtenegger purposefully refused to appear on behalf of CVS the morning of the TRO hearing. He took no further actions on behalf of CVS. [Note.] He chose to remove himself from that association before the injunction was even issued, and any facts linking him with CVS after August 21 are so attenuated that it will

---

4.  No one has suggested a reason why Rose did not make this call himself if, as discussed below, Lichtenegger's role was to be limited to making a special appearance at the hearing.

5.  Reply Memorandum in Support of Larry Lichtenegger's Motion for Summary Judgment, filed April 20, 2011 ("Reply"), 6:8-10.

1  be impossible for [BMO] to show by clear and convincing
2  evidence that Lichtenegger *acted on behalf of* CVS in
   any capacity.

3  Reply, 6:11-15, emphasis in original.

4  **B.  Lichtenegger's Greater Involvement**

5      The court finds that Lichtenegger's involvement with Salyer,
6  CVS, and/or the drum line, both before and after the TRO was
7  issued, was nowhere near as circumscribed as he contends.  First,
8  on Friday, August 21, before the TRO hearing the following
9  Monday, he left a message for the trustee's counsel advising that
10 he had been asked to make a special appearance.  However, rather
11 than leaving it at that, he added, "I wanted to inform you that
12 I've investigated and confirmed that the drums [sic] shipped on
13 Thursday -- they are already gone.  That makes your application
14 for a TRO moot.  You may have other issues, but not a TRO."[6]

15     With those words, Lichtenegger went well beyond actions that
16 might be expected from someone whose role is limited to
17 considering whether to make a special appearance.  Quite the
18 contrary, they went directly to the substance of the application
19 for the TRO.  They were clearly designed to convince the
20 trustee's counsel that his application for a TRO was too late.
21 In fact, had the trustee's counsel relied on those words, as
22 Lichtenegger almost certainly intended him to, he might have
23 foregone the hearing altogether and lost any chance of preventing
24 the shipment of the drum line.[7]  Lichtenegger's present

25 _____

26     6.  Larry J. Lichtenegger's Documentary Evidence in Support
   of Motion for Summary Judgment, filed March 21, 2011 ("LDE"), 70.
27
      7.  In fact, when the trustee's counsel returned his call
28 later that day, Lichtenegger again said he understood the drum
   line had shipped the previous day and "requested that the hearing

1  contention -- that he did not represent any person or entity in
2  connection with the drum line -- appears disingenuous in light of
3  this language.

4      Next, it appears Lichtenegger did not have a firm basis on
5  which to "confirm" to the trustee's counsel that the drum line
6  had already shipped.  He has testified he left the voicemail
7  message at 3:16 p.m. on Friday.  BMO Exhibits, 000713.  At 3:29
8  p.m. that day, he was copied with an e-mail from Segal to Salyer
9  stating, "I just spoke to Larry [Lichtenegger] and Gerard [Rose].
10 If the goods have already shipped, the TRO application is
11 mooted."  BMO Exhibits, 000276, emphasis added.  At 3:31 p.m.
12 that day, Lichtenegger e-mailed a single line to Salyer:
13 "Confirm drums shipped on Thursday?"  Id., 000277.  On Sunday,
14 August 23, Salyer e-mailed Lichtenegger, "Equipment does not ship
15 out until Wednesday earliest."  Id., 000278.  And seven minutes
16 later, "Departs Thursday."  Id., 000280.[8]

17     Despite this new knowledge, which directly contradicted what
18 he had "confirmed" to the trustee's counsel, Lichtenegger
19 testified as follows on September 1, 2009, the day after the drum
20 line actually shipped, concerning his decision not to appear at
21 the August 24 hearing:

22         Over the weekend [August 22-23], I debated the
           usefulness of my appearance in light of my conflict
23         with the deposition [the scheduling conflict referred

24
_____
25 be continued as there was no longer an emergency."  Exhibit
   Appendix in Support of Plaintiff's Opposition to the Motion of
26 Larry Lichtenegger for Summary Judgment, filed April 13, 2011
   ("BMO Exhibits"), 000713.
27
      8.  Lichtenegger did not submit these e-mails with the
28 Motion and made no mention of them; they were submitted by BMO in
   its opposition.  Lichtenegger does not deny receiving them.

- 6 -

to above], the non-schedule notification by Courtcall
[a call Friday afternoon informing him the TRO hearing
was not on calendar], and the fact that the drum line
had already shipped and the hearing was a non-event.  I
decided that my appearance at the hearing, if in fact
one would occur, was useless as there was nothing I
could do to aid the court or any of the parties in this
dispute.

BMO Exhibits, 000713-714.

The court need not determine at this time Lichtenegger's
truthfulness in making that statement on September 1 in light of
Salyer's two e-mails to him on August 23.  The court also need
not decide whether Lichtenegger's failure to correct his earlier
misinformation to the trustee's counsel -- misinformation he knew
the trustee's counsel had conveyed to the court in a declaration
-- gives rise to liability.  Indeed, Lichtenegger contends, and
the court might later determine, that he was precluded by duties
to a client (although he claims he had none) or by the attorney-
client privilege from divulging the new information.  For present
purposes, the court finds that these e-mails raise serious
questions about the credibility of Lichtenegger's present
contentions that his role was limited to deciding whether to make
a special appearance, and that as such, he could not have been
covered by the TRO.[9]

But Lichtenegger did not stop there.  He did not, as he
contends, have "only one possible engagement -- to specially

---

9.  The Salyer e-mails of August 23 also raise questions
about the credibility of Lichtenegger's present testimony that
"[a]t all times relevant to this motion, my only understanding
was that the drum line had been shipped from CVS's control and
the shipment could no longer be stopped."  Declaration of Larry
J. Lichtenegger in Support of Motion for Summary Judgment, filed
March 21, 2011, 2:13-14.

appear at the hearing." Reply, 9:11-12.  A series of e-mails on
August 24 and 25, 2009, among Salyer and various attorneys,
including Lichtenegger, leads to the conclusion that, far from
divorcing himself from the process and the players after the TRO
hearing, Lichtenegger remained very much involved.

Beginning on Monday, August 24, Salyer and a group of
attorneys, including Lichtenegger, exchanged a series of e-mails
in which it was suggested that Lichtenegger contact the attorney
for Olam, an entity that had by that time purchased the debtor's
business operations from the estate, and threaten to sue Olam if
it would not return certain property.  Lichtenegger responded by
asking for the name and phone number of Olam's attorney.  He
agreed with Putterman that they needed to think carefully about
their approach "because of the possible effect on the subcon
case" (presumably the trustee's substantive consolidation
action), LDE 196, and stated that he "wanted to be sure of entity
separation before [he] called [Olam's attorney]."  Id.

Lichtenegger then expressed confusion about the drum line
versus certain "color sorters," stating,

> I thought the drum line was shipped out already and was
> the subject of the TRO on Monday.  Could be just my
> confusion.  Help.  Left a message for Scott [Salyer],
> but he has not responded.[10]

Putterman's response was not to the point, and Lichtenegger
replied, "I'll find out."  LDE 195.

For purposes of this Motion, the court need not determine
what person or entity Lichtenegger was representing in these

_____

10.  LDE, 195-196.

1 exchanges, whether these or other discussions or e-mails
2 concerned the drum line or something else, or whether
3 Lichtenegger played any role in the transfer of the drum line
4 after the TRO was issued.  For present purposes, the court
5 concludes from these e-mails that Lichtenegger continued to play
6 some significant role with Salyer and/or his attorneys
7 immediately after the TRO was issued and before the drum line
8 actually left the Port of Oakland, a role he now attempts to
9 repudiate.

**III.   CONCLUSION**

11    For the reasons discussed above, the court cannot conclude
12 that there are no genuine issues of material fact with respect to
13 Lichtenegger's role in the events leading up to the drum line
14 being shipped out of California.  As a result, the court cannot
15 conclude that Lichtenegger is entitled to judgment on the
16 contempt motion as a matter of law.  <u>See</u> <u>Celotex v. Catrett</u>, 477
17 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986).

18    For the reasons set forth above, the Motion will be denied.
19 The court will issue an appropriate order.

Dated:  __May 9__ , 2011        _Robert Bardwil_
                                ROBERT S. BARDWIL
                                United States Bankruptcy Judge

1      **CERTIFICATE OF MAILING**

2          I, Andrea Lovgren, in the performance of my duties as Deputy
       Clerk to the Honorable Robert S. Bardwil, caused to be mailed by
3      ordinary mail a true copy of the attached document to each of the
       parties listed below:

4

5      Kevin Coleman
       Michael Carlson
6      Schnader Harrison Segal & Lewis
       One Montgomery Street, Suite 2200
7      San Francisco, CA 94104- 5501

8      Andrea Miller
       Nageley Meredith & Miller
9      8001 Folsom Blvd., Suite 100
       Sacramento, CA 95826

10

       Paul Pascuzzi
11     Felderstein Fitzgerald
           Willoughby & Pascuzzi
12     400 Capitol Mall, Suite 1450
       Sacramento, CA 95814

13

       James Banks
14     James Moses
       Banks & Watson
15     813 Sixth Street, Suite 400
       Sacramento, CA 95814-2403

16

       Bank of Montreal
17     c/o James Spiotto
       Chapman and Cutler
18     111 W Monroe Street
       Chicago, IL 60603

19

       Marc Levinson
20     Orrick, Herrington & Sutcliffe
       400 Capitol Mall
21     Sacramento, CA 95814

22     DATE: May 9, 2011

23                              _Andrea Lovgren_____
                                Deputy Clerk
24

25

26

27

28