

```
                    FILED

                 FEB - 6 2018

          UNITED STATES BANKRUPTCY COURT
            EASTERN DISTRICT OF CALIFORNIA
```

### UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF CALIFORNIA

In re:                              )    Case No. 09-29162-D-11
                                    )
SK FOODS, L.P.,                     )
                                    )
                    Debtor.         )
_____     )
                                    )
BRADLEY D. SHARP, Chapter 11        )    Adv. Pro. No. 09-2543-D
Trustee,                            )
                                    )    Docket Control No. TJD-8
                    Plaintiff,      )
                                    )
v.                                  )
                                    )
CSSS, LP, a California limited      )    DATE:  January 10, 2018
partnership,                        )    TIME:  8:30 a.m.
                                    )    DEPT:  D
                    Defendant.      )
_____     )

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

### MEMORANDUM DECISION

On January 25, 2014, this court issued a judgment in favor of the plaintiff, Bank of Montreal ("BMO"), and against Gerard Rose ("Rose") and Larry Lichtenegger ("Lichtenegger") (collectively, the "defendants") jointly and severally in the amount of $350,000. The judgment was based on the court's order of January 21, 2014 granting BMO's motion for summary judgment against the defendants as respondents to a motion for contempt (the "contempt motion") brought by BMO's predecessor in interest in this adversary proceeding, Bradley Sharp (the "trustee"),

chapter 11 trustee in the case of SK Foods, L.P. ("SK Foods"). The defendants appealed from the judgment. The district court affirmed the judgment; however, the Ninth Circuit Court of Appeals reversed and remanded the matter to this court, finding that this court had made credibility determinations, which are inappropriate on a motion for summary judgment.

Therefore, this court conducted an evidentiary hearing/trial on the date and at the time set forth above. The parties agreed at the last status conference held before the evidentiary hearing/trial that the evidentiary record was closed. That is, they agreed that the supporting declarations and exhibits submitted by each party prior to the appeals would be admitted into evidence and the parties would submit no further direct evidence, but each would have the opportunity to cross-examine the other's witnesses.

At the evidentiary hearing/trial, Lichtenegger sought to call a new witness, attorney Malcolm Segal. After discussion, Lichtenegger made an offer of proof as to what Segal would testify to and BMO did not object. The substance of the offer of proof is described in note 11 below. In addition, at the evidentiary hearing/trial, Lichtenegger took the stand and testified under oath subject to cross-examination. Thus, the court was able to observe his conduct and demeanor and to assess his credibility.

Having considered the declarations and exhibits filed by the parties, together with their witnesses' testimony on cross-examination at the evidentiary hearing/trial, the court concludes

that the judgment will stand, as subsequently satisfied in part.[1]

Applicable Legal Standards

The standard for finding a party in civil contempt is well settled: "The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." FTC v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999), quoting Stone v. City & County of San Francisco, 968 F.2d 850, 856 n.9 (9th Cir. 1992) (internal citations omitted). "[The contemnors] must show they took every reasonable step to comply." Stone, 968 F.2d at 856 n.9. "Intent is irrelevant to a finding of civil contempt and, therefore, good faith is not a defense." Id. at 856.

The TRO and Lichtenegger's Conduct

BMO seeks entry of a judgment against Lichtenegger as a sanction for his alleged violation of this court's Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, filed August 24, 2009 (the "TRO"). The TRO (1) restrained CSSS, LP, dba Central Valley Shippers ("CVS"), its officers, agents, servants, employees, and attorneys, and those in active concert or participation with CVS or with its officers, etc., from, among other things, moving certain equipment referred

---

1. After the remand, BMO and Rose entered into a settlement pursuant to which BMO retained $100,000 of the funds Rose had deposited with BMO pending the appeals. Thus, the amount remaining due on the judgment is $250,000 plus interest. The settlement was approved by this court as a good faith settlement, on notice to Lichtenegger, and Rose was dismissed from the adversary proceeding.

- 3 -

1  to by the parties as a Drum Line to any location outside of
2  California; and (2) ordered CVS to produce a corporate designee
3  to testify at a deposition about, among other things, the
4  location of the Drum Line and any plans to move it.  BMO contends
5  Lichtenegger violated both of these provisions of the TRO.  The
6  court agrees.

7       As the following discussion shows, Lichtenegger knew well
8  before the Drum Line left California that the trustee had gotten
9  wind of the intention of Scott Salyer ("Salyer"), the principal
10 of SK Foods, to ship the Drum Line to New Zealand, and
11 Lichtenegger knew the trustee was trying to stop the shipment.
12 Lichtenegger conveyed to the trustee's attorney, before the
13 hearing on the trustee's TRO application, a statement that the
14 Drum Line had already shipped -- more specifically, that it was
15 "already gone,"[2] whereas at the time of that communication,
16 Lichtenegger had not confirmed that statement, and in fact, had
17 undertaken no investigation to confirm it.  Lichtenegger soon
18 learned -- again, before the hearing -- that the Drum Line had in
19 fact not shipped and would not ship for several days after the
20 TRO hearing, yet he failed to take any steps to correct the
21 inaccurate statement he had made to the trustee's attorney.  He
22 failed to do so despite the fact that he knew the trustee's
23 attorney had conveyed his inaccurate statement to the court.
24 Lichtenegger proceeded to do everything he could think of to
25 distance himself from the situation so as to create plausible

26
27 _____

     2.  Lichtenegger is the one who actually told the trustee's
28 attorney the Drum Line had already shipped; he did so at Rose's
    request.

                              - 4 -

deniability; the court, instead, finds his deniability entirely implausible.

The events relevant to the contempt motion took place in August and September of 2009, beginning August 21, when communications began among Rose, Lichtenegger, Salyer, and other members of Salyer's legal team concerning the TRO application and the status of the shipment of the Drum Line to New Zealand.[3] On Friday, August 21, these communications took place:

• 2:45 p.m.  The trustee's counsel, Michael Carlson ("Carlson"), called Rose and told him he would be filing an application for a temporary restraining order that day to prevent the movement of the Drum Line and would be appearing in court on Monday, August 24, at 11:00 a.m. on the application.  Rose asked Carlson to email him the moving papers; Carlson did that, and Rose retrieved them later that evening at his home and forwarded them by email to Salyer and three attorneys -- two who represented Salyer in one capacity or another, Malcolm Segal and Paul Pascuzzi, and one who represented certain of Salyer's related entities, Donald Putterman.  Carlson had also emailed the moving papers to Lichtenegger at 4:23 p.m. the same day.[4]

Rose told Carlson in the 2:45 p.m. conversation that he was leaving California early the next morning for a week-long

---

3.  The components of the Drum Line were sent in containers by truck from a ranch in the Central Valley of California to the Port of Oakland, California, and from there, were shipped to New Zealand.  The ship with the Drum Line containers did not leave the Port of Oakland for New Zealand until August 31, ten days after these communications began.

4.  Lichtenegger acknowledged at his deposition he received it that day and read it, either then or within 24 hours.

vacation, and thus, would be unable to attend the Monday morning hearing. Carlson replied that the hearing would go forward anyway.

- According to Rose, the same afternoon, after he had spoken with Carlson, Rose called Segal and "learned from him that the Drum Line had already been shipped out of the country, and that any TRO would be moot."[5]

- As Rose was going to be on vacation from early the next morning, August 22, through the following week, he called Lichtenegger and asked him to make a special appearance on Monday morning to oppose the TRO application. Rose testified in his declaration that he "arranged to have Mr. Lichtenegger appear specially for [Rose] at the hearing";[6] he also said Lichtenegger responded that he had another matter scheduled for Monday morning, but that he would appear at the TRO hearing if Rose could set up a telephonic appearance for him, which Rose then did.[7] According to Lichtenegger, and not disputed by Rose, Rose also asked him to call and tell Carlson that the Drum Line had already shipped and that the TRO application was moot. According to Lichtenegger, Rose said he was too upset by Carlson's "rude treatment" in their earlier conversation to make the call himself.[8]

---

5. Gerard A. Rose Decl., filed Sept. 19, 2013, at 5:8-9.

6. Rose Dep., BMO 511.

7. Lichtenegger's version is that he told Rose he had a scheduling conflict, but he would do what he could to help Rose.

8. Larry J. Lichtenegger Decl., filed Sept. 25, 2013 ("Lichtenegger Decl."), at 2:9.

1       • 3:20 p.m.  Salyer emailed Segal, Pascuzzi, Rose,

2  Lichtenegger, and another member of Salyer's legal team, Gary

3  Perry -- stating that, as they had heard, the trustee was going

4  to try to get a TRO against CVS; Salyer suggested they "attack"

5  the trustee and his attorneys for violating a settlement under

6  which Salyer's daughters' trusts, "which are the sole owners of

7  CVS," were released.  Salyer stated it was "[t]ime to pull the

8  gloves off and start asking for Sanctions and restraining orders

9  against the Trustee and his goons."  BMO 375.

10      • 3:25 p.m.  Lichtenegger left the following voicemail

11 message for Carlson:

12         Mr. Carlson, my name is Larry Lichtenegger.  I'm an
           attorney down in Carmel.  I've been asked to specially
13         appear on Monday morning in regard to your Application
           for a TRO.  I wanted to inform you that _I've_
14         _investigated and confirmed_ that the drums [sic] shipped
           on Thursday -- they are already gone.  That makes your
15         application for a TRO moot.  You may have other issues,
           but not a TRO.  My phone number is 831-626-2801.  Thank
16         you.[9]

17      It is undisputed that, as of August 21, the Drum Line was

18 not already gone and the TRO application was not moot.[10]

19      • 3:29 p.m.  Segal emailed Salyer, Pascuzzi, Perry, Rose,

20 and Lichtenegger, stating, "I just spoke to Larry [Lichtenegger]

21 and Gerard [Rose].  _If the goods have already shipped_, the TRO

22

23

24 _____

25      9.  Michael M. Carlson Second Suppl. Decl., filed Sept. 1,
   2009, BMO 176 ("Carlson Second Decl."), at 3:19-23, emphasis
26 added.

27      10.  By August 21, the components of the Drum Line had been
   transported by truck from the Central Valley to Oakland, and were
28 in the Port of Oakland awaiting documentation that would allow
   them to be shipped to New Zealand.

                                   - 7 -

application is moot."  BMO 377 (emphasis added).[11]

• 3:30 p.m.  Responding to Salyer's 3:20 p.m. email, described above, Lichtenegger emailed Salyer, Segal, Pascuzzi, Perry, and Rose, stating, "GAR [Rose] and I are dealing with this now."  BMO 378.[12]

• 3:31 p.m.  Responding to Segal's 3:29 p.m. email, Lichtenegger emailed Salyer, "Confirm drums shipped on Thursday?"  BMO 380.[13]

• 4:11 p.m.  Carlson returned Lichtenegger's call.  At that time, despite Lichtenegger's 3:31 p.m. question to Salyer seeking confirmation, a question that remained unanswered at 4:11 p.m., Lichtenegger took the liberty of telling Carlson it was his understanding the Drum Line had shipped the previous day; Lichtenegger also asked that the TRO hearing be continued "as

---

11.  At the evidentiary hearing/trial, Lichtenegger made an offer of proof regarding Segal's expected testimony, which BMO did not object to.  Thus, BMO stipulated "that Mr. Segal told Mr. Lichtenegger in their initial call with Mr. Rose that the Drum Line had shipped."  The court accepts that statement as true, but finds it significant that when Segal referred to the telephone conversation immediately after it occurred, he used the words "if the goods have already shipped" (emphasis added).  Similarly, it is important that two minutes later, Lichtenegger emailed Salyer asking him to confirm the Drum Line had shipped, and that Lichtenegger followed up with Salyer on the issue two days later, on Sunday, August 23.  See below.

12.  That Lichtenegger and Rose were "dealing with" the situation implies more involvement and collaboration than Lichtenegger's agreement to make a special appearance, and even than his agreement to make the phone call to Carlson that Rose was too upset to make.

13.  Lichtenegger sent this email because "[he] had read Segal's email and wanted to confirm what I had been told."  Lichtenegger Decl. at 2:13-14 (emphasis added).  This is an admission that Lichtenegger had not confirmed the statements he told Carlson in his 3:25 p.m. voicemail message that he had "investigated and confirmed."

- 8 -

there was no longer an emergency."[14]  Carlson responded that the
hearing would go forward as scheduled.  According to Carlson,
Lichtenegger confirmed he would be appearing by CourtCall at the
hearing on behalf of CVS.[15]

• 4:37 p.m.  Carlson emailed Rose and Lichtenegger a copy of
Carlson's supplemental declaration in support of the TRO
application, setting forth the text of Lichtenegger's 3:25 p.m.
voicemail message, quoted above.

• 4:38 p.m.  Rose and Lichtenegger had a four-minute cell
phone conversation.

Thus, the undisputed facts are that by the end of the day on
Friday, August 21, both Rose and Lichtenegger had received copies
of the TRO application and related documents by email; Carlson
had told both of them the hearing would go forward Monday
morning; and Lichtenegger had twice informed Carlson, once by
voicemail (at Rose's direction) and later in a telephone
conversation, that the Drum Line had already shipped, and
therefore, that the TRO application was moot.[16]  Lichtenegger also
knew by the end of the day Friday that Carlson had informed the

_____

14.  Larry Lichtenegger Decl., filed Sept. 1, 2009, BMO 133,
("Lichtenegger 9/1/09 Decl."), at 2:17-18.

15.  Carlson Second Decl., at 3:25-26.

16.  Again, the second of those statements -- in the 4:11
p.m. telephone conversation -- was made at a time when
Lichtenegger knew he needed confirmation of the shipment and had
sought it but had not received an answer.  Yet he did not qualify
his statement to Carlson -- he did not say "I think the Drum Line
has already shipped" or "I have heard it has already shipped and
I'm awaiting confirmation"; he simply said it was his
understanding the Drum Line had shipped the previous day, and
thus, he asked that the hearing be continued as "there was no
longer an emergency."

- 9 -

court of Lichtenegger's unqualified statement that he "[had]
investigated and confirmed that the drums [sic] shipped on
Thursday -- they [were] already gone."  In other words,
Lichtenegger knew Carlson had informed the court of his statement
that he had <u>investigated and confirmed</u> information he had in fact
not yet confirmed -- information Lichtenegger knew went to the
very heart of the relief the trustee would be seeking from the
court Monday morning.

Lichtenegger supplemented his declaration testimony at the
evidentiary hearing/trial.  He testified as regards Segal's
statement that the Drum Line "had shipped" that he believed that
to be true and in good faith transmitted that information to
Carlson.  He did not explain or address his prior statement to
Carlson that he had "investigated and confirmed" the information
at the time he used those words; indeed, it is clear he had only
Segal's word for it.

Presumably, however, Segal's email using the words "if the
goods have already shipped" raised a concern for Lichtenegger
that the information might not be accurate after all.  Thus, on
Sunday, August 23, the following transpired:

• 12:45 p.m.  Lichtenegger emailed Salyer asking him to call
because he "need[ed] some info to a decision" (presumably, in
order to come to a decision).  BMO 384.

• 4:40 p.m.  Salyer emailed Lichtenegger:  "Equipment does
not ship out until Wednesday earliest."  BMO 385.

• 4:47 p.m.  Salyer emailed Lichtenegger:  "Departs
Thursday."  BMO 388.

/ / /

1    Faced with the seemingly direct contradiction between the
2    statement in his Friday voicemail message that the Drum Line had
3    "shipped" the day before and Salyer's Sunday emails that it would
4    not "ship out" until several days later, Lichtenegger testified
5    in his declaration he had a telephone conversation with Salyer
6    that afternoon, Sunday, August 23, after Salyer's emails, in
7    which Salyer told him the Drum Line "had indeed shipped from CVS
8    the previous week." Lichtenegger Decl. at 3:13-14. This is a
9    truncated version of testimony Lichtenegger prepared in the
10   spring of 2011 which was not used at the time but which
11   Lichtenegger submitted as an exhibit in opposition to the summary
12   judgment motion. In that testimony, Lichtenegger stated that in
13   their August 23 telephone conversation, Salyer told him the Drum
14   Line "had indeed shipped from CVS the previous week and was
15   currently at the port awaiting departure."[17] Thus, whereas
16   Lichtenegger claims he knew from that telephone conversation that
17   the Drum Line had "shipped" from CVS, he also knew it was still
18   in port "awaiting departure."

19   Lichtenegger claimed in his declaration he then asked Salyer
20   "if the shipment could be stopped and was told that it could not
21   be stopped as it was already in transit." Lichtenegger Decl. at
22   3:15-16. Lichtenegger added that he "briefly discussed the
23   nature of the TRO pending proceeding and [Salyer's] duty to stop
24   the shipment if he could." Id. at 3:17-18. Lichtenegger stated
25   he "knew nothing of the nature of seaboard shipping and had no
26   reason to disbelieve [Salyer] when he said he could not stop it."
27   _____
28       17. Lichtenegger's Exhibits, filed Sept. 25, 2013, Ex. H,
     at 2:24-25.

                                - 11 -

*Id.* at 3:18-19.  Thus, "it did not appear important to know where in transit the Drum Line containers were if the shipment could not be stopped" (*id.* at 3:22-23), so he did not ask.  He added he had no one else to ask besides Salyer and Rose, whom he claimed he was unable to reach; he apparently did not try to contact Segal, who had been the source of the "if it has shipped" comment, or Pascuzzi.[18]

Thus, Lichtenegger knew that what he had earlier assured Carlson he had "investigated and confirmed" -- that the Drum Line was "already gone" -- was unequivocally false.  Yet he did not call or email Carlson to correct that statement or to qualify it in any way.  Further, Lichtenegger cancelled his CourtCall appearance, did not appear at the Monday morning hearing, on August 24, and did not in any other way or at any other time attempt to correct or qualify the statement he knew had been conveyed to the court:  the statement that the Drum Line was already gone.

---

18.  At the evidentiary hearing/trial, Lichtenegger merely confused matters when, citing dictionary definitions of the verb "to ship" as including various forms of transportation, he suggested it was accurate to state that the Drum Line "had shipped" by August 21 because it had been packed in containers and put on trucks that had left Visalia, California.  That testimony conflicts with his declaration testimony, where he referred only to his ignorance of seaboard shipping.  It also casts doubt on his ready acceptance of Salyer's statement that the shipment could not be stopped and Lichtenegger's casual conclusion that it did not seem important to know where in transit the Drum Line was.  Finally, in light of the request in the TRO application to restrain the affected persons and entities from "moving [the Drum Line] to a location outside California," which Lichtenegger has acknowledged he read either August 21 or August 22, his testimony at the evidentiary hearing/trial that in his mind the word "shipping" included leaving Visalia by truck merely reinforces the court's conclusion, discussed below, that Lichtenegger was and is simply looking for cover -- for plausible deniability.

- 12 -

Instead, he unilaterally concluded there was nothing he could do. Lichtenegger stated in a declaration filed after the TRO hearing, "I decided that my appearance at the [August 24] hearing, if in fact one would occur, was useless as there was nothing I could do to aid the court or any of the parties in this dispute." Lichtenegger 9/1/09 Decl. at 2:27-3:2. Of course, there was much Lichtenegger could have done to aid the court -- he could have appeared on August 24 and told the court the truth -- that the earlier information he had conveyed to Carlson, which he knew Carlson had conveyed to the court, was incorrect, and that the Drum Line had in fact not left the country and would not for several days. And that is exactly what Lichtenegger did not want to have to do.[19]

Lichtenegger claimed in his declaration he emailed Salyer at 12:45 p.m. Sunday, August 23, because "if the Drum Line was truly on its way and could not be stopped, I would just not attend the hearing as there was nothing I could do to aid the situation."

---

19. At the evidentiary hearing/trial, Lichtenegger testified that, given Salyer's attitude, there was nothing he could have done to stop the shipment of the Drum Line because he, Lichtenegger, was not in a position of authority and Salyer was not going to take instructions from him anyway. The court finds that to be an insufficient excuse for his failure to take any steps toward stopping the shipment, as required by the TRO. He might have ensured the TRO was served on Salyer; he might have contacted Segal or Pascuzzi, as well as Salyer, to discuss the matter; he might have supplied Salyer's name to Carlson as an individual with knowledge of the "location, storage and condition of the Drum Line and any plans, intentions or efforts to . . . transfer or move" it, as also required by the TRO. He did none of those things.

Further, if Lichtenegger believed Salyer would not take instructions from him in any event; that is, if he believed Salyer would not comply with a court-issued TRO, why did Lichtenegger formally substitute into the case as counsel for CVS just three weeks later?

- 13 -

Lichtenegger Decl. at 3:4-6.  This testimony is undercut by the fact that when Lichtenegger and Rose spoke on Friday afternoon and agreed that Lichtenegger would make the special appearance, Lichtenegger and Rose claim to have been <u>already</u> under the impression the Drum Line was gone.  Thus, although Lichtenegger <u>already</u> viewed the TRO application as moot (and had so informed Carlson), he nevertheless planned, as of Friday afternoon, to make a telephonic appearance at the hearing.  That fact conflicts with his testimony that he decided he would not appear "if the Drum Line was truly on its way and could not be stopped."

The only logical conclusion to be drawn from this inconsistency is that when Lichtenegger thought the Drum Line was already gone, he planned to attend the hearing -- presumably, to tell the court the TRO application was moot -- and it was only after Salyer informed him, on Sunday afternoon, that the Drum Line was still "at the port awaiting departure" and "would not ship out until Wednesday earliest" that Lichtenegger changed his mind and decided not to appear.  The court has no trouble concluding that the only reason Lichtenegger cancelled his CourtCall appearance was so that he, Rose, and Salyer could assert they did not have absolute and specific knowledge of the issuance of the TRO and of its terms.  This, they hoped, would provide Salyer with "cover," or plausible deniability, for failing to comply with the TRO and Lichtenegger and Rose with cover for failing to take "every reasonable step" to ensure that Salyer complied with it.

Lichtenegger claims his decision was influenced in part by his Friday afternoon telephone conversation with Carlson, in

- 14 -

which Carlson told him the transcript of Lichtenegger's earlier
voicemail message would be provided to the court, adding that
anything Lichtenegger said would be used to hold him or anyone
else who violated the TRO responsible.  Lichtenegger claims this
conversation "upset" him, which he says was an "emotional
condition" that contributed to his decisions "not to be involved
with the issues surrounding the Drum Line shipment" (Lichtenegger
Decl. at 2:22-24) and not to attend the hearing.  It also,
allegedly, led Lichtenegger "to do nothing when [Carlson's]
emails, faxes and Fed-Ex packages started coming in."  Id. at
2:27-28.[20]  Thus, he claims to have deliberately not read
Carlson's emails, faxes, or overnight mail; in fact, he went so
far as to unplug his fax machine when Carlson's faxes started
coming in.  In this way, if he is to be believed, Lichtenegger
hid his head in the sand and he did so at his peril.[21]

---

20.  It is undisputed that Carlson served the application
for the TRO and supporting papers on both Lichtenegger and Rose
by email on August 21.  It is also undisputed that Carlson served
the TRO itself, as issued by the court, on Lichtenegger and Rose
by mail and email the day it was issued, August 24, and that the
next day, August 25, Carlson wrote to Lichtenegger and Rose, by
fax, email, and overnight mail, with admonitions about obeying
the TRO.

21.  Lichtenegger goes so far as to admit that he ignored
Carlson's emails, mail, and faxes because he was afraid that
responding to them "would subject [him] to the responsibility
Carlson notified [him] of on August 21st."  Lichtenegger Decl. at
4:12-13.

Further, whereas he had said in his declaration, in
relatively casual fashion, that he had no reason to disbelieve
Salyer, at the evidentiary hearing/trial, he testified that
Salyer's attitude, and in particular, his aggressiveness, had
contributed to his decision not to appear at the TRO hearing and
not to be further involved.  (At the evidentiary hearing/trial,
he testified, "I didn't want to read them [the TRO papers].  I
didn't want to be involved.  I didn't want to be responsible.")
And at the hearing on the trustee's summary judgment motion, he

Assuming for the sake of argument only that Lichtenegger did not actually see the TRO, that is not sufficient to protect him from the consequences of ignoring it. First, there is the obvious fact that if a TRO could be evaded merely by refusing to look at it, no TRO would ever have teeth. Thus, under the applicable rule, it is not necessary that a restraining order or injunction be personally served on an individual in order to bind him or her to its terms. Instead, a restraining order or injunction binds individuals "who receive actual notice of it by personal service <u>or otherwise</u>." Fed. R. Civ. P. 65(d), incorporated here by Fed. R. Bankr. P. 7065 (emphasis added); <u>see also</u> <u>NLRB v. Sequoia Dist. Council of Carpenters</u>, 568 F.2d 628, 634 (9th Cir. 1977) (labor union officers were bound by cease and desist order served only on union's attorney and not on the officers); <u>Fidelity Mortg. Investors v. Camelia Builders, Inc.</u>, 550 F.2d 47, 52 (2nd Cir. 1976) ("a person is in contempt of court if he knowingly violates a court order, whether or not he received a formal notice."); <u>Central States, Southeast & Southwest Areas Health & Welfare & Pension Funds v. Transcon Lines</u>, 1995 U.S. Dist. LEXIS 11372, *22 (N.D. Ill. 1995) ("constructive notice, namely, less than actual knowledge but awareness of facts sufficient to cause a reasonable person to

---

stated that the tone of his Sunday afternoon telephone conversation with Salyer caused him to believe Salyer was "not intending to cooperate." Transcript of Dec. 18, 2013 hearing, filed Jan. 8, 2014, at 7:8-9.

In light of this testimony, it is ironic that Lichtenegger formally substituted in just three weeks later to represent one of Salyer's entities, CVS, in connection with the trustee's ongoing efforts to learn the whereabouts of the Drum Line.

inquire further, is adequate notice to a corporate officer of the existence of a court order to satisfy due process.").[22]

It is undisputed the TRO was served on Lichtenegger by email the day it was issued, August 24. Based on that fact and on the further evidence discussed above, the court is convinced Lichtenegger knew the TRO had issued (indeed, he testified at the evidentiary hearing/trial he assumed it had issued), knew what it provided, and knew it was not moot; that is, he knew the Drum Line had not left California. Rather than taking "every reasonable step" to ensure his clients' compliance with the TRO, he and Rose spent the next week pursuing a strategy they hoped would give them deniability. Lichtenegger decided not to make an appearance at the hearing and proceeded to deliberately ignore his faxes, overnight mail, and emails so he could argue he did not know for certain the TRO had issued until after the Drum Line had actually left the Port of Oakland. At the same time, Rose decided to ignore his mail, emails, and faxes, so he too could claim he was unaware of the TRO and its provisions, like Lichtenegger, in an effort to evade compliance with the TRO. In short, both treated the TRO as a hot potato neither wanted to touch.

/ / /

/ / /

---

22. "[W]here a corporate officer knows a court order has been entered against the corporation, but fails to inquire, as a reasonable person would, as to the terms of the order, he may properly be held in contempt. A rule which would allow a corporate officer to remain deliberately ignorant of the particulars of a court order, and thereby avoid a contempt citation, would defy common sense." Central States, 1995 U.S. Dist. LEXIS 11372, at *23.

## Lichtenegger as a Person Bound by the TRO

Lichtenegger claims he was not bound by the TRO because his relationship with CVS and Salyer was too attenuated. Thus, he contends he was not an attorney for CVS during the time the Drum Line was still in California. First, he claims he could not have been an attorney for CVS because he had not appeared as its attorney of record in any manner described in LBR 2017-1(b)(2); thus, under subsection (b)(1) of the same rule, he could not participate in the action.[23] This rule is intended to govern an attorney's participation in proceedings in court, not to define the circumstances under which an attorney-client relationship is created or the circumstances in which an attorney, as an attorney for a party, assumes duties of candor and truthfulness to opposing counsel and the court, as discussed below. Further, the rule was not designed to shield attorneys from the consequences of their actions and choices. Thus, the court rejects Lichtenegger's position.

Lichtenegger also relies heavily on the fact that he agreed to make only a "special appearance" for Rose at the TRO hearing if he could. However, the record does not support Lichtenegger's position that what he was doing for Rose, CVS, and Salyer regarding the Drum Line and the TRO application was limited to making a "special appearance" that carried no responsibility for him as an attorney for a party. At the time the Drum Line incident arose, Lichtenegger was not a stranger to Salyer and his

---

23. "Except as permitted in Subpart (c) of this Rule [not applicable here], no attorney may participate in any action unless the attorney has appeared as an attorney of record." LBR 2017-1(b)(1).

related entities; he was not someone Rose called out of the blue
to ask for the "favor" of making a special appearance.  Instead,
in early August of 2009, Salyer had asked Lichtenegger "to
represent a list of unnamed entities to avoid a conflict by
already engaged attorneys" (Lichtenegger Decl., filed March 21,
2011, at 1:27-28), to develop a new action against BMO regarding
a property at Lake Tahoe, to expunge a lis pendens the trustee
had filed against certain farming properties, and to sign papers
supporting a Rule 12(b)(6) motion in the trustee's substantive
consolidation action.  Id.  Lichtenegger has testified he signed
those latter papers "on behalf of a number of entities which, at
that time, I knew nothing about (nor was it important for me to
know that detail as the motion was directed at the failure to
state causes of action in the first instance)."  Id. at 2:5-7.[24]

     The court concludes from these facts that Lichtenegger was
part of Salyer's legal team and he was prepared and willing to do
what he was asked by Salyer or other members of his legal team.
This included representing whatever person or entity Salyer, or a
member of his legal team, asked Lichtenegger to represent.  The
only reason his prospective appearance at the TRO hearing was
characterized as a special appearance was that if Rose had not
been on vacation, he would have made it.  The court believes
that, although they characterized it as a special appearance,
Lichtenegger thought he was working for Salyer and/or one of his

_____

     24.  On August 17, 2009, four days before the Drum Line
communications began, Lichtenegger signed and filed a motion to
dismiss the trustee's complaint in AP No. 09-2342 as counsel for
17 Salyer entities, including Monterey Peninsula Farming, LLC
("MPF"), which according to Rose, was the sole owner of CVS.
Rose signed the motion as counsel for CVS and two other entities.

entities.   This conclusion is supported by the series of emails
among Salyer, Putterman, Segal, Pascuzzi, Rose, and Lichtenegger
on August 24 (the day of the TRO hearing) and August 25, in which
Lichtenegger was asked to call the attorney for Olam (purchaser
of SK Foods' business operations from the trustee) and demand the
return of eight color sorters.   At one point in this exchange,
Lichtenegger emailed Pascuzzi as follows:   "It is not clear to me
who the owner of the 8 color sorters is that I am representing.
Tell me and I will call after lunch."   BMO 417 (emphasis added).
In short, the court finds Lichtenegger was part of the Salyer
legal team and viewed himself as such.

        In that capacity, Lichtenegger deliberately conveyed
information on behalf of Salyer and CVS for the sole purpose of
persuading Carlson to drop the TRO application.   He did not
purport to limit his remarks to what he had learned from another
attorney; he stated that he had "investigated" the facts and he
had "confirmed" that the Drum Line was "already gone."   An
attorney proposing nothing more than to make a special appearance
for another attorney does not undertake those types of
activities.   Then, after he left the voicemail message,
Lichtenegger emailed Salyer, Segal, Pascuzzi, Perry, and Rose,
stating that he and Rose were "dealing with [the Drum Line
situation] now."   The court finds that as of Friday afternoon,
August 21, Lichtenegger was an attorney for CVS and Salyer with
regard to the Drum Line and the TRO application, and assumed all
the associated duties and responsibilities, including the duty
not to conceal from the court or opposing counsel material facts
that showed his earlier information was inaccurate (see

- 20 -

discussion below), and the duty to take "every reasonable step" to ensure compliance with the TRO.[25]

If all of that is not sufficient to find Lichtenegger was bound by the TRO (and the court believes it is), the court also finds that, as discussed above, Lichtenegger, at all times the TRO was in force, was acting with regard to the Drum Line and the TRO in concert with Rose, who himself was an agent of and attorney for CVS, the named target of the TRO (see discussion in the court's ruling underlying the January 21, 2014 order). As the TRO bound CVS, its officers, agents, etc., "and those in

---

25. In an ironic twist, Lichtenegger suggests he may have had some responsibility to provide further information to the trustee if Carlson had, in response to his representation that the Drum Line had already shipped, withdrawn the TRO application. He states, "Had the Trustee agreed to cancel the TRO hearing based on Lichtenegger's representation about the Drum Line having already shipped, [Lichtenegger's] obligations may have been different, but certainly not when the representation had NO consequence." Lichtenegger P. & A., filed Sept. 25, 2013 ("Lichtenegger P. & A."), at 11:7-9. This argument, first, incorrectly assumes an attorney's duty of candor and truthfulness -- to both opposing counsel and the court, as discussed below -- arises only if he succeeds in hood-winking one or the other. Second, it incorrectly assumes Lichtenegger's false information about the shipment caused no harm, whereas, as discussed below, the court is convinced that had Rose and Lichtenegger not acted in concert to prevent the trustee from discovering the truth, a scheme that began with Lichtenegger's voicemail message to Carlson, the shipment very likely would have been stopped.

Although the court made this point in its ruling underlying the January 21, 2014 order, at the evidentiary hearing/trial, Lichtenegger was adamant that because nothing he did or did not do prevented the trustee from obtaining the TRO on Monday morning, his conduct had no effect and he should not be penalized for it. What he refuses to recognize is that his deliberate conduct preceding the issuance of the TRO misdirected the trustee and the court as to the whereabouts of the Drum Line and that had he taken steps to correct that misdirection, such as by contacting Salyer and/or the rest of the legal team or by directly correcting the false impression he had given the trustee's attorney, the whereabouts of the Drum Line would likely have been discovered in time to prevent the shipment.

active concert or participation with CVS or with its officers, agents, [etc.]," Lichtenegger was bound by the TRO. Finally, as indicated above, Lichtenegger had already appeared in AP No. 09-2342 as attorney of record for MPF, the owner of CVS. For this reason also, the court concludes Lichtenegger was acting as an attorney for CVS in the Drum Line controversy, and as such, was bound by the TRO.

Lichtenegger claims that if he was "inadvertently and unknowingly"[26] put into the position of an attorney for CVS by his initial phone call to Carlson, he "completely complied with the duties of an attorney before he withdrew from his favor to Rose[,] as he did advise [CVS's] agent, Scott Salyer, of the pending TRO and the consequences of disobeying it." Id. at 2:1-3. The court cannot conclude that whatever admonition he may have given to Salyer -- even if Lichtenegger actually made it -- in any way qualified as "every reasonable step" he could have taken to ensure Salyer's compliance. Assuming Lichtenegger actually believed Salyer's statement that the shipment could not be stopped (which the court does not believe), Lichtenegger had a duty to make at least some effort to determine whether that was true, rather than simply taking Salyer's word for it. Lichtenegger does not even pretend he thought Salyer's remark meant a court order could not have stopped the shipment. He did not ask Salyer whether a court order could stop it, and he has suggested no factual scenario or legal theory under which the shipment of the Drum Line, as of August 24, after the TRO had

---

26.  Lichtenegger Decl. at 1:28.

- 22 -

issued, could not have been stopped.  The court finds that as of
the time the TRO issued, and through the next seven days, the
shipment could and should have been stopped, and that, had
Lichtenegger not concealed from Carlson and the court that the
Drum Line was still in port "awaiting departure," the shipment
likely would have been stopped.

Lichtenegger claims his only obligation in this matter was
his promise to help Rose by appearing specially for him at the
hearing if he could; in Lichtenegger's view, he had no duty to
the trustee or the court.  On the contrary, once Lichtenegger
made an affirmative unqualified representation to Carlson that
the Drum Line had shipped and was "already gone," and thus, that
the TRO application was moot, and then learned that those
statements were false, he had a duty to correct the inaccuracy he
had conveyed to Carlson, which, he knew, Carlson had conveyed to
the court.  "It is the duty of an attorney . . . :  (d) To
employ, for the purpose of maintaining the causes confided to him
or her those means only as are consistent with truth, and never
to seek to mislead the judge or any judicial officer by an
artifice or false statement of fact or law."  Cal. Bus. & Prof.
Code § 6068.  This subsection "unqualifiedly require[s] an
attorney to refrain from acts which mislead or deceive the
Court."  Oliner v. Kontrabecki (In re Cent. European Indus. Dev.
Co.), 51 Bankr. Ct. Dec. 31, 2009 Bankr. LEXIS 639, *17 (Bankr.
N.D. Cal. 2009), citing Di Sabatino v. State Bar, 27 Cal.3d 159,
162 (1980).  "Furthermore, it is settled that concealment of
material facts is just as misleading as explicit false statements
. . . ."  Oliner, 2009 Bankr. LEXIS 639, at *18, citing Di

- 23 -

<u>Sabatino</u>, 27 Cal.3d at 183.  "These same rules of candor and truthfulness apply when an attorney is communicating with opposing counsel." <u>Oliner</u>, 2009 Bankr. LEXIS 639, at *18, citing <u>Hallinan v. State Bar</u>, 33 Cal. 2d 246, 249 (1948).

In this case, the court concludes Lichtenegger was acting as attorney for CVS with regard to the Drum Line when he agreed to make the appearance for Rose, when he contacted Salyer about the whereabouts of the Drum Line, when he informed Carlson the Drum Line had shipped and was "already gone" and the TRO was therefore moot, and when he "dealt with" the Drum Line and TRO issues with Rose.  In fact, Lichtenegger's August 21, 2009, 3:30 p.m. email to Salyer, Segal, Pascuzzi, Perry, and Rose more accurately describes the reality of the situation when Lichtenegger lets the other members of Salyer's legal team know that he and Rose "are dealing with the [TRO] now."  The court concludes Lichtenegger was acting as an attorney for CVS (and Salyer) with regard to the Drum Line and the TRO from at least August 21, and as such, he was bound by the TRO.  His belated disclaimer is nothing but a self-serving attempt to escape his responsibility to take all reasonable steps to ensure compliance with the TRO.

<u>Lichtenegger's Duty to Produce a Witness</u>

Finally, BMO contends Lichtenegger violated the TRO when he failed to produce a corporate designee to testify at a deposition, within five days after entry of the TRO, about, among other things, the current location of the Drum Line and any plans to move it, as the TRO required of CVS and its officers, etc., and those in active concert or participation with them. Lichtenegger reiterates here the argument that he had decided not

to accept the representation of CVS and not to appear at the
August 24 hearing; thus, he claims he was under no duty to comply
with this aspect of the TRO.  The court has already found
Lichtenegger was bound by the TRO.  His alleged failure to have
any contact with Salyer or other members of the legal team is
irrelevant, as he was bound by the TRO to be in contact with
them, to attempt to stop the shipment of the Drum Line, and to
produce a witness knowledgeable as to its whereabouts.
Lichtenegger does not claim to have taken any steps to produce
such a witness until September 23, when he formally entered the
litigation as CVS's attorney.  As the Drum Line was by then well
on its way to New Zealand, and as Lichtenegger was bound by the
TRO from several days before it left the Port of Oakland, his
efforts after September 23, if any, were too little, too late.

The court finds by clear and convincing evidence that
Lichtenegger was working, in concert with Rose, as an attorney
for CVS and was bound by the TRO to produce a knowledgeable
individual for deposition, but failed to do so.  Thus, the court
concludes that Lichtenegger failed to comply with this aspect of
the TRO.

Miscellaneous Issues

Lichtenegger cites the attorney-client privilege, claiming
he could not have told the court in any event that the Drum Line
was still in port.  "[A] party asserting the attorney-client
privilege has the burden of establishing the [existence of an
attorney-client] relationship and the privileged nature of the
communication.  Because it impedes full and free discovery of the
truth, the attorney-client privilege is strictly construed."

<u>United States v. Graf</u>, 610 F.3d 1148, 1156 (9th Cir. 2010)
(citations omitted).  Thus, "[t]he party asserting the privilege
bears the burden of proving each essential element."  <u>Id.</u>  The
elements are eight-fold (<u>id.</u>); Lichtenegger has provided no
analysis, merely an unsupported conclusion; as such, he has
failed to satisfy this burden.

     For example, the attorney-client privilege apparently did
not prevent Lichtenegger from conveying what Rose wanted him to
convey -- that the Drum Line was already gone and the TRO
application was moot.  But when it comes to his responsibility to
correct that wrong information and comply with the TRO after it
issued, Lichtenegger falls back on the privilege.  It is entirely
possible in this circumstance that the privilege was waived.
"The privilege which protects attorney-client communications may
not be used both as a sword and a shield.  Where a party raises a
claim which in fairness requires disclosure of the protected
communication, the privilege may be implicitly waived."  <u>Kaiser
Found. Health Plan, Inc. v. Abbott Labs., Inc.</u>, 552 F.3d 1033,
1042 (9th Cir. 2009), quoting <u>Chevron Corp. v. Pennzoil Co.</u>, 974
F.2d 1156, 1162 (9th Cir. 1992).  Lichtenegger has made no
showing regarding the question of waiver, which is one of the
eight elements.

     Lichtenegger also contends the TRO was a prohibitory
injunction, not a mandatory one, and thus, that it merely
prohibited action and "[did] not compel everyone to which [sic]
the TRO was addressed . . . to take some active step to assist in
enforcement of the TRO."  Lichtenegger P. & A. at 15:15-17.  In
other words, he claims, the TRO only "prohibit[ed] active conduct

- 26 -

1  and [was] not addressed to passive activity (i.e. doing

2  nothing)." Id. at 15:24. Thus, "Lichtenegger had no duty to

3  actively 'ensure' compliance." Id. at 14:17. This argument

4  represents a misunderstanding of the distinction between

5  prohibitory and mandatory injunctions.

6      A prohibitory injunction prohibits a party from taking
       action and preserve[s] the status quo pending a
7      determination of the action on the merits. A mandatory
       injunction orders a responsible party to take action.
8      A mandatory injunction goes well beyond simply
       maintaining the status quo [p]endente lite [and] is
9      particularly disfavored.

10 Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d

11 873, 878-79 (9th Cir. 2009) (citations omitted; internal

12 quotation marks omitted).[27] "[T]he test for whether an injunction

13 is prohibitory or mandatory can be found in its effect on the

14 status quo ante litem, which means the last, uncontested status

15 which preceded the pending controversy." Ariz. Dream Act

16 Coalition v. Brewer, 2013 U.S. Dist. LEXIS 69603, *13 (D. Ariz.

17 May 16, 2013), citing Marlyn Nutraceuticals, 571 F.3d at 879

18 (emphasis added).

19      Thus, the distinction between the two types of injunctions

20 is not, as Lichtenegger would have it, that one requires someone

21 to do something and the other requires someone merely to refrain

22 from doing something. The test is whether the injunction would

23 preserve the status quo between the parties as it existed prior

24 to the controversy. In this case, the status quo between the

25

26 _____

27      27.  See also Coffee Dan's, Inc. v. Coffee Don's Charcoal
   Broiler, 305 F. Supp. 1210, 1216 (N.D. Cal. 1969) [the question
   is "will it merely proscribe a course of action (prohibitory
28 injunction) or will it require defendant to take affirmative,
   costly remedial steps (mandatory injunction)."].

parties at the time the controversy arose was that the Drum Line
was still in California; it was not on its way to New Zealand.
That is the status quo the trustee sought to maintain when he
applied for the TRO; that is the status quo the court intended to
maintain when it issued the TRO.  That preserving that status quo
may have required someone to do something, as opposed to doing
nothing, did not turn the TRO into a mandatory injunction.  And
the fact that the TRO was a prohibitory injunction did not mean
that those bound by it had merely to do nothing in order to
comply.  To comply with the TRO; that is, to preserve the status
quo of the Drum Line remaining in California, those bound by the
TRO were required to take all reasonable steps to ensure that the
Drum Line remained in California, and that it was not shipped to
New Zealand (or anywhere else outside of California).  As
discussed above, Lichtenegger was bound by the TRO and he did not
comply.  The court also notes that had Lichtenegger appeared at
the TRO hearing and corrected his false statement to Carlson;
that is, had he informed the court the Drum Line had, in fact,
not shipped and was in the Port of Oakland, the trustee could
have sought an order from the court that would have specifically
prohibited the Drum Line from leaving the Port and preserved the
status quo.

Appropriate Sanction

    BMO requests a sanction in an amount appropriate to
compensate it for the loss of the Drum Line, an outcome the court
concludes could have been prevented if Rose and Lichtenegger had
complied with the TRO.  BMO requests an award of $350,000, based
on the price CVS agreed to pay to SK Foods when CVS purchased the

- 28 -

Drum Line in December of 2008.  Rose's only challenge to that
value was that an individual named Ruben Gallardo, a
foreman/supervisor for MPF, testified the Drum Line needed
repairs and was not worth fixing.  The court's review of
Gallardo's deposition testimony indicates he had never seen the
Drum Line before he was asked to clean and pack it, and he had
almost no understanding of the Drum Line.  He did testify that
"to [him] it was all destroyed."  BMO 672.  He believed it had
been mishandled when it was put into the containers in which he
found it.  He said he couldn't say what its value was, but it
would "probably cost more to fix it than -- to repair it, because
it was poorly installed in the containers, damaged."  Id.  The
court finds that Gallardo (through no fault of his own) was not
qualified to provide an opinion as to the value of the Drum Line.
The court also notes that Salyer, Rose, and Lichtenegger went to
great lengths to maintain possession and control of the Drum Line
and to avoid compliance with the TRO and this conduct is
inconsistent with their assertion that the Drum Line was of
little value.

Lichtenegger's approach to the question of the sanction
amount is to refer to the Drum Line as "piles of rusted junk."
Lichtenegger P. & A. at 22:20.  At the evidentiary hearing/trial,
he cross-examined BMO's witness, Michael Carlson -- the same
Michael Carlson who was involved in the telephone conversations
and emails of August 21, 2009 -- extensively regarding who had
told him what about the condition and value of the Drum Line.
Carlson responded that whatever information he had received
regarding those matters was received after the fact; that is,

- 29 -

after the TRO had been issued and the Drum Line had been received in New Zealand.

Lichtenegger focused heavily on an email to Carlson from Ken Gifford, managing director of K-Pack International Ltd., the company in New Zealand that designed and built the Drum Line and to which the Drum Line was shipped in the fall of 2009. As Lichtenegger emphasized at the evidentiary hearing/trial, the email referred to the Drum Line having been vandalized before it was shipped to New Zealand, to electrical parts have been damaged or being missing, and to the Drum Line having been "left in a poor state." James Heiser Decl., filed Jan. 11, 2013, Ex. B to Ex. 5 (BMO 090). The email was sent by Gifford to Carlson on November 29, 2009, three months after the Drum Line left the Port of Oakland.

Gifford estimated, in the same email, that the cost to repair the Drum Line would be about $400,000 and that the Drum Line, "complete in restored order made operational would sell for USD $1,500,000 as a used/reconditioned production line." (Id.) Lichtenegger suggested in his questioning of Carlson that only K-Pack could have repaired the Drum Line and that the trustee would have had to send it to New Zealand anyway and he suggested the trustee did not have enough money in the estate to have it repaired. Mr. Carlson did not have answers to Lichtenegger's questions on this issue and Lichtenegger offered no other evidence. The bottom line is that Lichtenegger's line of cross-examination called for nothing but unsupported speculation, to which the court gives little or no weight.

/ / /

At the evidentiary hearing/trial, Lichtenegger also suggested the cost to have the Drum Line shipped back to California would have been relatively modest -- less than $50,000 -- and that the trustee should have mitigated his damages by doing that.  However, this court has previously found that the return of the Drum Line would have been impractical under the circumstances.  <u>See</u> final ruling on DC No. TJD-5, filed Feb. 13, 2013 in this adversary proceeding.  Finally, the court must question why, if the cost to return the Drum Line were so low, Lichtenegger and Rose, having by their failure to comply with the TRO enabled it to leave the country, did not themselves try to retrieve it from New Zealand.

As already determined, it was Rose's and Lichtenegger's conduct, acting in concert with Salyer, that resulted in the Drum Line being shipped out of California in the first place; it was their subsequent failure to produce a knowledgeable witness that resulted in the trustee not learning of its whereabouts until two and one-half months later, after he had incurred significant attorney's fees and costs.

"'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'"  <u>Universal Pictures Co. v. Harold Lloyd Corp.</u>, 162 F.2d 354, 369 (9th Cir. 1947), quoting <u>Bigelow v. RKO Radio Pictures, Inc.</u>, 327 U.S. 251, 265 (1946).

> 'The fact that personal property which is injured or destroyed by the wrongful or negligent act of another, has no market value, does not restrict the recovery to nominal damages only; its value or the plaintiff's damages must be ascertained in some other rational way

- 31 -

and from such elements as are attainable. In such case the proper measure of damages is generally its actual value or its value to the owner.  The value of an article may be shown by proof of such elements or facts as may exist- such as its cost, the cost of reproduction or replacing it, its utility and use . . . .'

Universal Pictures Co., 162 F.2d at 370 (citation omitted).

This principle has been applied in the bankruptcy context. In Lundell v. Ulrich (In re Lundell), 236 B.R. 720 (9th Cir. BAP 1999), the trustee sought damages based on an alleged decline in value of certain stock during the time he was trying to obtain the stock from the debtors.  As against the defendants' claims regarding the appropriate method for measuring damages, the Panel agreed with the trustee's approach, finding that "the difficulty in calculating the damages [was] due in large part to the malfeasance of the Debtors."  236 B.R. at 725.[28]

In short, Lichtenegger's arguments that the Drum Line had no value are not supported by the evidence; further, the difficulty of fixing the value of the Drum Line was created by his conduct, acting in concert with Salyer and Rose, in failing to comply with the TRO.  Finally, the court has previously entered judgment against CVS in this adversary proceeding in an amount well in

---

28.

Where a defendant by his own wrong has prevented a more precise computation . . . [the factfinder] may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. . . .  Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.  It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.

Id., quoting Bigelow, 327 U.S. at 264-65.

excess of the $350,000 BMO is seeking here.[29] In these circumstances, the court is satisfied that the value of the Drum Line, for purposes of fixing the amount of appropriate sanctions against Lichtenegger, was at least $350,000, the price at which Salyer and Rose, acting for CVS, agreed it would be sold by SK Foods to CVS. (As already indicated, the amount of the sanction has been reduced in part by Rose's settlement payment.)

To conclude, the clear and convincing, in fact compelling, evidence in this matter supports the conclusions that Lichtenegger, in active concert and participation with CVS, through its agent Salyer and its attorney Rose, and as an attorney on behalf of CVS and Salyer, was bound by the TRO, which was a specific and definite order of this court, and that Lichtenegger failed to take all reasonable steps to ensure that CVS and Salyer, the latter acting on behalf of CVS, owner of the Drum Line, complied with the TRO. The court reaches these conclusions after having heard Lichtenegger's oral testimony at the evidentiary hearing/trial and having observed his demeanor and assessed his credibility. In short, the court's original findings, analysis, and conclusions, as set forth in the court's original ruling on BMO's motion for summary judgment, remain unchanged by the testimony submitted at the evidentiary hearing/trial. The court finds, by clear and convincing evidence, that Lichtenegger's strategy from August 21 forward was

---

29. On BMO's motion for summary judgment against CVS, the court entered judgment against CVS in the amount of $1,500,000, the value of the Drum Line at the time of the transfer in question in that motion. That judgment has been affirmed on appeal.

- 33 -

1 to ignore the TRO so he could later claim, as he does now, he was
2 not responsible.

3     For the reasons stated, the judgment against Lichtenegger
4 will stand, as partially reduced by Rose's payment.  The court
5 will issue an order.

6 Dated:  February 06, 2018

8                                      _Robert Bardwil_
9                                 Robert S. Bardwil, Judge
10                                United States Bankruptcy Court

# Instructions to Clerk of Court
## Service List – Not Part of Order/Judgment

The Clerk of Court is instructed to send the Order/Judgment or other court generated document transmitted herewith to the parties below. The Clerk of Court will send the Order via the U.S. Mail.

Gerard Rose
808 Sheridan Road
Wilmette IL 93921

Larry J. Lichtenneger
3850 Rio Rd #58
Carmel CA 93923

Todd J. Dressel
595 Market St 26th Fl
San Francisco CA 94105

Todd Dressel
McGuire Woods LLP
Two Embarcadero Center, Suite 1300
San Francisco CA 94111

Office of the US Trustee
501 I Street, 7th Floor
Sacramento CA 95814